IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| JUNIOR ALDRIDGE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2:14-cv-02874-STA-egb |
| | ) | |
| SHAWN PHILLIPS, | ) | |
| | ) | |
| Respondent. | ) | |

ORDER GRANTING MOTION TO DISMISS,
DENYING CERTIFICATE OF APPEALABILITY,
AND
DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

Junior Aldridge, a Tennessee state prisoner, has filed a petition under 28 U.S.C. § 2254 seeking habeas corpus relief ("petition"). (ECF No. 1.) Before the Court is the motion of Respondent, Shawn Phillips, to dismiss the petition as untimely. (ECF No. 14.) For the reasons that follow, the motion is **GRANTED**.

**Aldridge's State Proceedings**

A Shelby County Criminal Court jury convicted Aldridge of first degree murder, second degree murder, and especially aggravated robbery. *State v. Aldridge,* No. W2007-01722-CCA-R3-CD, 2009 WL 1579239, at *1 (Tenn. Crim. App. June 5, 2009), *perm. app. denied* (Tenn. Oct. 19, 2009). The trial court merged the murder convictions and imposed concurrent sentences of life imprisonment and forty years. *Id.* The Tennessee Court of Criminal Appeals ("TCCA") affirmed Petitioner's convictions and sentences on June 5, 2009. *Id.* at *8. On October 19, 2009, the Tennessee Supreme Court denied discretionary review. *Id.*

1

at *1. Petitioner signed his *pro se* petition for state post-conviction relief on April 24, 2010, (ECF No. 10-14 at 46), and the petition was filed on May 10, 2010. (*Id.* at 12.) The post-conviction court denied the petition on October 4, 2012, (ECF No. 10-15 at 13), and the TCCA affirmed. *Aldridge v. State,* No. W2012-02409-CCA-R3-PC, 2013 WL 12181749, at *1 (Tenn. Crim. App. Sept. 19, 2013). On January 14, 2014, the Tennessee Supreme Court denied discretionary review. (ECF No. 10-22.)

## Aldridge's § 2254 Petition and Limitations Period

Petitioner submitted his *pro se* § 2254 petition to prison officials for mailing on October 30, 2014. (ECF No. 1.) His sole claim is that the trial court's "exclusion of certain evidence denied him the right to present a defense," in violation of his right to due process. (*Id.* at 5.)

A § 2254 petition is subject to a one-year statute of limitations. 28 U.S.C. § 2244(d)(1). The limitations period begins to run from the latest of four possible dates:

> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.*

In this case, § 2244(d)(1)(A) applies, which means that Aldridge had one-year from the date on which his judgment of conviction became final to file his habeas petition. Taking into

account statutory tolling under 28 U.S.C. § 2244(d)(2), the last day Aldridge could timely file his § 2254 petition was October 14, 2014.

The date is arrived at as follows. First, Petitioner's judgment of conviction became final on January 19, 2010. Aldridge appealed his conviction to the Tennessee Supreme Court, but did not appeal to the United States Supreme Court. His judgment of conviction thus became final when the time for appealing to the United States Supreme Court expired, which was ninety days after the Tennessee Supreme Court denied permission to appeal. *See Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000). Permission to appeal was denied on October 19, 2009, and ninety days from that date was Sunday January 17, 2010. The next day, January 18, 2010, was Martin Luther King, Jr., Day, a federal holiday. Under Supreme Court Rule 30, if a deadline for filing with the Supreme Court falls on "Saturday, Sunday, [or] federal legal holiday," the "period shall extend until the end of the next day that is not a Saturday, Sunday, [or] federal legal holiday," which in this case was Tuesday January 19, 2010.

Second, the limitations period for Aldridge's federal habeas claim began to run on January 20, 2010. The one-year statute of limitations for filing a federal habeas petition begins to run on the day after the conviction of judgment becomes final. *Bronaugh*, 235 F.3d at 285-86.

Third, the limitations period ran for ninety-four days, and then was tolled from April 24, 2010, to January 14, 2014. The one-year limitations period is tolled during the time "a properly filed application for State post-conviction or other collateral review . . . is pending . . . ." 28 U.S.C. § 2244(d)(2). It is not tolled, however, during the ninety-day period in which a defendant could seek a writ of certiorari to the United States Supreme Court on appeal from the denial of post-conviction relief. *Lawrence v. Florida*, 549 U.S. 327, 332-36 (2007). Giving Aldridge the benefit of the prison mailbox rule, the state post-conviction petition was filed on April 24, 2010,

3

the day he signed it. *See Goins v. Saunders,* 206 F. App'x. 497, 498 n. 1 (6th Cir. 2006) (per curiam) (courts are to treat *pro se* prisoner complaints "as filed on the date [the prisoner] signed it."). The Tennessee Supreme Court denied permission to appeal on January 14, 2014.

Finally, the last day of the limitations period was October 14, 2014. When the limitations "clock" resumed ticking the day after Aldridge's state post-convictions proceedings concluded on January 14, 2014, two-hundred and seventy-one days remained in the limitations period. Two-hundred and seventy-one days later was Sunday October 12, 2014, and the next day, Monday October 13, 2014, was Columbus Day, a federal holiday. Under Federal Rule of Civil Procedure 6(a), if a deadline for filing in the district court falls on a "Saturday, Sunday, or Legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday," which in this case was Tuesday October 14, 2014.

Giving Petitioner the benefit of the prison mailbox rule, the petition was filed on October 30, 2014, the day he signed it. Aldridge therefore filed his petition sixteen days after the limitations period expired on October 14, 2014.

**Discussion**

Respondent has moved to dismiss the petition on the ground that Aldridge's habeas claim is untimely. Aldridge concedes that he filed his petition late, but opposes dismissal, arguing that he is entitled to have the limitations period tolled for extraordinary circumstances, pursuant to *Holland v. Florida*, 560 U.S. 631, 649 (2010). He also argues that he is actually innocent of first degree murder and therefore is entitled to escape the limitations period pursuant to *McQuiggin v. Perkins,* 133 S.Ct. 1924, 1930–31 (2013). On February 23, 2017, the Court held an evidentiary hearing. Two witnesses were presented on the issues relevant to equitable tolling, and the Court heard oral argument regarding Petitioner's gateway claim of actual innocence. Based on the

record, the Court concludes that Aldridge has failed to demonstrate that he is entitled to equitable tolling and has not established a gateway claim of actual innocence.

**I**. **Equitable Tolling for Extraordinary Circumstances**

    **A. Legal Standards**

The one-year statute of limitations in 28 U.S.C. § 2244(d) is not a jurisdictional bar and is subject to equitable tolling under extraordinary circumstances. *McClendon v. Sherman*, 329 F.3d 490, 492 (6th Cir. 2003). "Traditional" equitable tolling requires the petitioner to show that (1) "he has been pursuing his rights diligently;" and (2) "some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 646, 649 (internal quotation marks omitted). A causation requirement is included in the extraordinary circumstance element, as the circumstance must have "caused [the] litigant's delay." *Menominee Indian Tribe of Wisconsin v. United States*, 136 S. Ct. 750, 755 (2016); *see also United States v. Garcia-Guia*, No. 3:07-cr-81, 2013 WL 5329232, at *2 (S.D. Ohio Sept. 20, 2013) ("A defendant must prove a causal connection between the alleged lockdowns and his inability to timely file his motion.").

A petitioner need not show "maximum feasible diligence," but only "reasonable diligence." *Holland*, 560 U.S. at 653 (internal quotation marks omitted). He must, however, demonstrate that he exercised reasonable diligence before, during, and after the extraordinary event. *See Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (petitioner not entitled to equitable tolling because he was not diligent before or after the alleged extraordinary circumstance); *Solomon v. United States*, 467 F.3d 928, 933-34 (6th Cir. 2006) (petitioner, whose transfer to a different prison without his legal papers was an extraordinary circumstance, exercised reasonable diligence *before* the transfer by seeking a copy of his transcripts; *during* the time he spent in the

new prison by contacting the federal court clerk; and *after* he was returned to his original prison by filing his petition within one month).

The Supreme Court recently clarified that a litigant satisfies the second part of the tolling test "only where the circumstances that caused [his] delay are both extraordinary *and* beyond [his] control." *Menominee Indian Tribe*, 136 S. Ct. at 756 (emphasis in original). *Pro se* habeas petitioners alleging entitlement to equitable tolling often claim that a prison restriction or event was an extraordinary circumstance that prevented timely filing. Prison conditions commonly cited are those affecting the inmate's ability to research issues and draft the petition, *see e.g.*, *Frank v. Chavez*, No. C 11-5204 YGR PR, 2012 WL 4002960, at *5 (N.D. Cal. Sept. 11, 2012); print or make copies of the petition or other documents, *see e.g.*, *Ramirez v. Yates*, 571 F.3d 993, 998 (9th Cir. 2009), secure notary services, *see e.g.*, *Baker v. Perry*, No. CIV. 2:12-10424, 2012 WL 5328677, at *3 (E.D. Mich. Oct. 29, 2012); or mail the petition. *See e.g.*, *Birch v. Neven*, No. 2:11-cv-00516-GMN, 2013 WL 3367622, at *8 (D. Nev. July 3, 2013).

A petitioner pointing to restrictive prison conditions as the cause of his filing delay has an uphill battle; prison routines or regulations, even when attendant to highly-restrictive environments such as segregation or lockdown, rarely constitute extraordinary circumstances. *United States v. Magiera*, No. Cr. 2:12-32-DCR, 2014 WL 5364799, at *1 (E.D. Ky. Oct. 21, 2014) ("[I]nstitutional transfers, periods of confinement under more restrictive conditions than the general population, and lack of ready access to legal paperwork and law libraries are not 'extraordinary circumstances'; they are the usual incidents of prison life.") (internal quotation marks omitted); *Banzant v. United States*, No. 13-2795-STA-DKV, 2016 WL 3582210, at *4 (W.D. Tenn. June 28, 2016) ("[M]ost courts have concluded that prison lockdowns . . . do not amount to extraordinary circumstances supporting equitable tolling.") Prison restrictions are not

usually "extraordinary" "because prisoners, who are familiar with the routine restrictions of prison life, must take such matters into account when calculating when to file a federal habeas petition." *Allen v. Johnson*, 602 F. Supp. 2d 724, 728 (E.D. Va. 2009) (internal quotation marks and brackets omitted). If courts were regularly to regard "[o]rdinary prison limitations" as extraordinary circumstances, the equitable tolling "exception [would] swallow the rule." *Ramirez*, 571 F.3d at 998.

Nevertheless, in the rare case, a prison condition may qualify as an extraordinary circumstance. *See e.g., Solomon*, 467 F.3d at 933-34. The more severe a restriction and the closer it occurs to the end of the limitations period, the stronger the petitioner's argument that it constitutes an extraordinary circumstance. *See id.* (defendant entitled to equitable tolling when he was transferred to a different prison without his legal papers a month before the limitations period expired).

The party seeking equitable tolling bears the burden of establishing the elements of diligence and extraordinary circumstance. *Pace,* 544 U.S. at 418; *Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010). In determining whether the burden has been met, a court must be mindful of the Sixth Circuit's "repeated[] caution[] that equitable tolling should be granted 'sparingly.'" *McSwain v. Davis*, 287 F. App'x 450, 456 (6th Cir. 2008) (quoting *Solomon,* 467 F.3d at 933).

**B. Testimony**

When the Tennessee Supreme Court denied Aldridge's application to appeal on January 14, 2014, there were two-hundred and seventy-one days remaining in the one-year limitations period. At the evidentiary hearing before the Court, Aldridge testified that he was incarcerated at West Tennessee State Penitentiary ("WTSP") in a "closed-security" unit during those two-

hundred and seventy-one days.¹ He described the closed-security environment as highly-restrictive: inmates are "locked down most of the time," and "get an hour out and an hour for rec and an hour for shower" each day. (Hrg. Tr., ECF No. 38 at 14-15.) If an inmate housed in a closed-security unit "want[s] to make use of the law library or mailing facilities or finding a notary public," he would have to "[f]ile a request with the unit team." (*Id.* at 15.) Legal materials, according to Aldridge, are "not allowed in [the] cells," but are kept in "a room," thus requiring inmates to first request their materials and then request access to the library. (*Id.* at 16.) Aldridge testified that he "made plenty" of requests to access his legal papers and use the library, but "[e]ither . . . [he] wouldn't hear anything" back from prison officials or "was told [he] had to wait." (*Id.* at 15.)

Petitioner further testified that his unit experienced a lockdown in October of 2014. He described a lockdown this way: "Lockdown means that you don't move. You don't take no shower. You don't do nothing. It's just you're there until the warden sa[ys] otherwise." (*Id.* at 17.) He stated that during the October 2014 lockdown he had "[n]o access at all" to his legal papers, the library, a notary public, or the mail system. (*Id.*) The lack of access, he testified, was "the reason" his petition was filed late. (*Id.*) Aldridge timely filed all "other legal papers." (*Id.*)

On cross-examination, Aldridge confirmed that he was able to have the petition notarized on October 9, 2014. He explained, however, that at the time of notarization, the petition "was filled out, but it wasn't finished." (*Id.* at 20.) According to Petitioner, when he signed the petition on October 30, the prison was still on lockdown and that was the earliest day he was able to produce a completed petition and get it into the prison mailing system. He testified that during the lockdown he "had sent a request . . . to send [the petition] off but . . . never could get an

---

¹ The parties' calculations of the days remaining in the limitations period differ slightly from the Court's calculation, but not enough to make a difference in the outcome of the case.

8

answer." (*Id.* at 22.) Aldridge again stated that he had tried to get access to his legal papers and the library many times during the limitations period but "never got an answer" from prison staff. (*Id.* at 24.) He explained that he could produce only a single copy of one of his requests (attached to his reply brief and dated September 2014) because prison staff lost his papers when they moved his property during his transfer from WTSP to another prison. When asked why he "didn't mention the lockdown" in the section of the petition form that asks about timeliness, Aldridge replied "I couldn't tell you that. I don't know why." (*Id.* at 24.)

The Court asked Aldridge to describe what part of the petition was not completed on October 9, the day it was notarized. Aldridge explained that the petition only needed to be mailed. (*Id.* at 26-27.) He further stated that he believed the lockdown started on October 9, the same day the petition was notarized. The unit then stayed on lockdown, according Aldridge, for "[a]bout two months." (*Id.*) When asked why he alleged in his reply brief that the lockdown lasted "23 or 28 days," Aldridge stated that the lockdown became a "partial lockdown" after the first "20 or 21, 22 days." (*Id.* at 29.) At that point, inmates were allowed to submit items for mailing. (*Id.*) He said that October 30 was the first opportunity he had to mail the petition after the facility went on lockdown. (*Id.* at 30.)

William Bryant, a unit manager at WTSP, testified that he oversaw Aldridge's unit in 2014. (*Id.* at 31-32.) He stated that the closed-security environment imposed certain restrictions on inmates, but generally allowed them to move freely within the unit: "Closed-security inmates are inmates that require supervision during the chow movements[,] . . . are not able to leave the facility for a funeral visit[,] . . . [and] require one year before they're eligible to leave the facility for parole." (*Id.* at 32.) "[O]ther than that, they have the same privileges on the compound as minimum or medium custody inmates." (*Id.*)

9

According to Bryant, the inmates in closed-security units "are allowed to have legal materials" in their cells "equivalent to a 2-foot by 2-foot box[,] . . . [A]nything over that is stored in another room." (*Id.* at 34.) He stated that inmates must present a request form to prison staff in order to use the library, get documents notarized, or go to the mailroom. "[I]nmates are allowed to make requests directly to" Bryant as he makes his daily round of the unit. (*Id.* at 35.) During the daily round, he "go[es] to every cell." (*Id.* at 35.) Approximately three times a week, the warden makes the rounds and "walk[s] by every cell and [inmates] are allowed to ask questions then." (*Id.*) The "turnaround on a request" is "[a]t the longest, 48 hours." (*Id.* at 36.) On cross-examination, Bryant seemed to contradict his earlier testimony by stating that an inmate in closed-security does not have to make a written request to use the library. Instead, "[a] library call is open in the morning, afternoon, and the evening" and library is open "37.5 hours a week." "[G]eneral call-outs" for use of the library "are made three times a day, five days a week." (*Id.* at 40.)

Bryant testified as to the duration of lockdowns. Lockdowns are triggered by "an incident or allegation" and usually last "a period of 72 hours as we wait for information to come in concerning the incident." (*Id.* at 33.) In the eighteen years he has worked at WTSP, the "longest period" of lockdown he ever experienced was "six to seven days." (*Id.*) He stated that during October of 2014, the prison did not place any unit on a lockdown that lasted "two months" or even "23 or 28 days," and had "never restricted movement of a population for" that long. (*Id.* at 33-34.)

Bryant also testified about the restrictions imposed on inmates during lockdowns at WTSP. When lockdowns occur, prison staff "feed[] meals in the unit[,] . . . so staff are constantly in the units, walking around; and [the inmates] are able to ask [staff] questions

10

directly throughout the day." (*Id.* at 35.) Bryant explained that if an inmate were facing an upcoming filing deadline during a lockdown, he could ask staff to mail the document and "[w]e'd mail it for them." (*Id.* at 36.) When asked whether Aldridge's petition could have been mailed soon after October 9, assuming a lockdown that restricted his access to the library and mailroom, Bryant answered that he or "anyone of the staff that work in our unit team" would have mailed the petition for him. (*Id.* at 42.)

### C. Analysis

Petitioner argues that the October 2014 lockdown was an extraordinary circumstance that prevented him from timely filing his petition and that he diligently tried to prepare the petition before, during, and after the lockdown, and to mail it as soon as he could. Specifically, he claims he diligently sought to perform the research and drafting tasks necessary to prepare his petition in the months before the October lockdown, but the restrictions in closed-security impeded his access to the library and his legal papers, and his requests to prison staff for access were ignored. He also claims that he could not complete and mail the petition until October 30, 2014, because he had no access to the library or mailing services during the lockdown. The record does not support Aldridge's assertions.

Petitioner's first hurdle is to establish the dates the lockdown was in place. *See generally Pace,* 544 U.S. at 418 (the burden of proof is on the party seeking equitable tolling); *see also Fox v. Holland*, No. 15-cv-02134 YGR, 2016 WL 4943003, at *5 (N.D. Cal. Sept. 16, 2016) (petitioner seeking equitable tolling must establish the "particular amount of time" the extraordinary circumstances existed) (internal quotation marks omitted). Aldridge testified to a probable start date of October 9, but offered inconsistent estimates of the lockdown's duration. Bryant, on the other hand, credibly testified that lockdowns at WTSP usually last seventy-two

hours, but he has known them to last up to seven days. Giving Petitioner the benefit of his estimated start date and the longest time frame to which Bryant testified, the Court finds that the lockdown began on October 9, 2014, and ended no later than October 16, 2014.

Aldridge must next establish that the lockdown was an extraordinary circumstance and that before, during, and after the lockdown he diligently sought to complete and mail his petition. Bryant's testimony shows that lockdowns are a normal part of prison life at WTSP, and in that sense are not extraordinary. Nevertheless, the Court will assume that the lockdown was an extraordinary circumstance, as Aldridge has not met his burden to show that the lockdown prevented him from researching and drafting the petition and submitting it for mailing by October 14, despite reasonable diligence. He also has not demonstrated that he diligently sought to mail the petition immediately after the lockdown was lifted. *See Pace,* 544 U.S. at 418 ("Even if we were to accept petitioner's theory [that he satisfied the extraordinary circumstance test], he would not be entitled to relief because he has not established the requisite diligence.").

*1. Researching and Drafting the Petition*

By his own admission, Petitioner was finished researching and drafting the petition by October 9, 2014, which was the day the petition was notarized and the first day of the lockdown. Although Petitioner testified on direct examination that the petition was not finished on the day it was notarized, when pressed by the Court in a follow-up colloquy he stated that the only task left was to mail the petition, which would include having it weighed and paying the $5 fee. Therefore, because Aldridge was finished researching and drafting the petition by October 9, he cannot show that the lockdown, which began the same day, prevented him from completing those tasks.

Even assuming, *arguendo,* that Aldridge did not have the petition finished by October 9, and therefore entered the lockdown with an incomplete document, he has not shown that in the months leading up to the lockdown he was diligent in undertaking the research and drafting tasks. Although he testified that he made several failed requests[2] for access to the library and his legal papers during those preceding months, his testimony is not credible. Petitioner claimed that he could not produce copies of his written requests because prison staff lost all but one of them, dated September 2014, during a transfer. However, Aldridge did not provide from memory any details about the requests. Nor did he offer even a rough sketch, such as estimating the number of requests made (he only described the amount as "plenty"), identifying the dates of the requests by general reference to month or time of year; or providing the first or last names or titles of any of the prison staff members to whom he submitted the requests. The Court therefore concludes that Aldridge has not demonstrated that he sought access to the library or his legal papers earlier than September 2014.

Second, the limitations on library access which Aldridge faced in closed-security were not so severe as to excuse his tardy efforts. According to Bryant, Aldridge had at least one opportunity each day to request access to the library and his legal papers when Bryant performed his daily rounds of the units. Bryant also stated that Aldridge would have waited no more than forty-eight hours to gain access once a request was made. Petitioner easily could have "take[n] . . . into account" these predictable and short delays. *Allen*, 602 F. Supp. 2d at 728. The Court therefore concludes that the limitations on access to the library and legal papers in Aldridge's

---

[2] As noted, Bryant described the restrictions on inmates who are housed in closed-security units at WTSP. The Court credits that testimony, except in one respect. Bryant's testimony was inconsistent as to whether the inmates are free on "general call" to use the library, or whether they need to make a written or verbal request for permission. The Court therefore, accepts Aldridge's testimony that inmates, including him, were required to make a written request to use the library and gain access to any legal papers not kept in their cells.

closed-security unit did not prevent him from beginning the researching and drafting tasks as early as mid-January of 2014, when his state post-conviction proceedings concluded. Petitioner was not diligent in researching and drafting the petition prior to September 2014.

   *2. Mailing the Petition*

Petitioner likewise has not shown that he reasonably endeavored to submit the petition to prison officials for mailing during or after the lockdown. Although Aldridge testified that he had sent a request for mailing sometime during the lockdown (he did not specify when), but "never could get an answer," (ECF No. 38 at 22), Bryant testified that prison staff members are in close contact with inmates during lockdowns and that they will accommodate an inmate's request to mail a document if the inmate is facing an imminent filing deadline. The Court credits Bryant's testimony over Petitioner's vague assertion the he tried to get his petition into the prison mail system before October 30. In addition, Aldridge waited until fourteen days after the lockdown to submit the petition to prison officials for mailing. His explanation for waiting until October 30 is that the lockdown continued, at least in partial form, until then. As noted, the Court does not find Aldridge's assertions regarding the length of the lockdown to be credible. The Court therefore concludes that Aldridge has not offered any credible reason why he did not mail the petition during or immediately after the lockdown.[3]

The Court therefore concludes that, even if the October 2014 lockdown is assumed to have been an extraordinary circumstance, Petitioner has not demonstrated that it prevented him

---

[3] Even if the Court were to toll the limitations period for the seven-day period of October 9 through October 16, and extend the limitations period seven days beyond October 16, Aldridge still would have had to file the petition by October 23. *See e.g., Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 171 (S.D.N.Y. 2000) ("[E]ven assuming arguendo that the AEDPA statute of limitations should be tolled during the [147 days] Rhodes was hospitalized[,]. . . . Rhodes's petition would still be untimely" because it "was filed 291 days after the . . . deadline.")

from filing his petition by the due date or at the earliest possible time after the lockdown ended, despite reasonable diligence. Aldridge is therefore not entitled to equitable tolling of the limitations period under the traditional equitable tolling doctrine.

**II. Actual Innocence**

A credible showing of actual innocence will allow a petitioner to "overcome" the statute of limitations, rather than provide him an excuse for the late filing. *McQuiggin,* 133 S.Ct. at 1928; *cf. Souter v. Jones,* 395 F.3d 577, 588–90, 597–601 (6th Cir. 2005) (a credible claim of actual innocence can equitably toll the statute of limitations). "Actual innocence" for that purpose is not a constitutional claim but rather "a gateway through which a petitioner may pass" to secure judicial review of the merits of his habeas claim. *McQuiggin,* 133 S.Ct. at 1928. A petitioner asserting a gateway claim must "persuade[] the district court that, in light of . . . new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* In the Sixth Circuit, a petitioner probably does not need to show that the evidence is "newly discovered," but only that the evidence was not presented to the jury. *See Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012). Credible actual-innocence gateway claims are "rare." *McQuiggin*, 133 S. Ct. at 1928.

In determining whether it is more likely than not that no rational juror would have convicted the petitioner in light of the new evidence, a court must assess the probative value of the new evidence and consider it in light of the evidence submitted at trial. *House v. Bell*, 547 U.S. 518, 538 (2006). A court must consider all of the evidence "without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" *id.* at 538 (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)), but must nevertheless pay "due

15

regard to" the "unreliability of" any of the evidence. *Schlup*, 513 U.S. at 328 (internal quotation marks omitted).

In support of his gateway claim that he is actually innocent of first degree murder, Aldridge submits "the statement of the decedent, Mr. [Travis] Clariett, that he was threatened by [his ex-girlfriend] Ms. [Renarda] Irving three days before he was killed." (Hrg. Tr., ECF No. 38 at 43.) Because the defense made an offer of proof at trial, the victim's statements are contained in the state-court record.[4] *See Aldridge*, 2009 WL 1579239, at *5.

The offer of proof shows that two days before he was killed, Clariett told Collierville police officer Neil Young that Irving stole his car and that he was fearful of her. In his written statement to the police, the victim made the following allegations:

> At approximately 8:30 p.m., I walked outside for break, that's when I saw my white Cadillac Sedan Deville, missing. I have reason to believe that Renarda Irving stole my car, because she had been threatening me and she had opportunity, Monday. She came to my job and threaten[ed] to do something bad to me.

*Id.* at *6.

Petitioner argues that it is more likely than not that no reasonable juror hearing the excluded evidence would have convicted him of first degree murder. The State contends that Aldridge's newly presented evidence does not establish a gateway claim because the jury heard "multiple eye witness accounts that petitioner was the shooter." (ECF No. 35 at 2-3.) In counterpoint, Aldridge argues that only one eyewitness besides Irving identified him as the shooter, and that witness's testimony is unreliable because he viewed the events through his car's rearview mirror. (Hrg. Tr., ECF No. 38 at 43.) Considering the newly presented evidence in

---

[4] The trial judge excluded the evidence as unreliable hearsay. In his sole habeas claim, Petitioner alleges that the trial court's decision deprived him of his due process right to present a defense. (*See* ECF No. 1 at 5.)

conjunction with the evidence submitted at trial, the Court agrees with the State that Aldridge has not established his actual innocence.

The prosecution's case for first and second degree murder and especially aggravated robbery turned primarily on the testimony of Irving and the victim's nephew, Jeremy Hull, both of whom were at the crime scene, along with that of a passerby named Anthony Franklin. Irving testified that moments before Clariett was shot, she was sitting in the passenger side of a car belonging to the victim and the victim was sitting in the driver's seat. The car was parked in front of Irving's house. According to Irving, Aldridge approached the rear passenger side of the car carrying a plastic bag, demanded money from Irving and the victim, and then shot Clariett. (Cr. Tr., ECF No. 10-4 at 122, 126-129.)

Franklin testified that he saw "a male black approach[] [a] vehicle from the passenger side and fire[] shots into the vehicle," but did not "see well enough" to identify Aldridge as the shooter. (Cr. Trial Tr., ECF No. 10-5 at 110-111, at 129.) He described the black male as carrying a plastic bag. (*Id.* at 120.) On cross-examination, Franklin clarified that he did not see the shooter fire into the car, but only the heard gunshots. (*Id.* at 129.)

Jeremy Hull, Clariett's nephew, testified that he was sitting in his car at the time of the murder, parked in front of the car in which Clariett and Irving were sitting. Through his rearview mirror, Hull observed Aldridge approach the "passenger side, back window" of his uncle's car while holding a bag, pull a gun out of the bag, and shoot Clariett. (Cr. Tr., ECF No. 10-4 at 62-64.) On cross-examination, defense counsel pointed out some inconsistencies between Hull's trial testimony and his statements to police, but the witness was unwavering in his identification of Aldridge as the shooter. On redirect examination, Hull said that his uncle had approximately $2500 in his possession. (*Id.* at 105.) He further stated that after the shot was

fired, Aldridge ran, but the former girlfriend remained at the scene and was "hollering and crying." (*Id.* at 106.).

The defense's theory was that Irving shot the victim because he refused to give her $2500 in "tax money." Irving's testimony supported that theory, in part. Irving testified that she and the victim met on the day of the murder in order for Irving to return the victim's car to him and for the victim to give Irving "'tax money." (Cr. Tr., ECF No. 1—4 at 113, 115.) Irving explained that

> the victim [had] claimed her daughter as a dependent on his income tax returns even though she and the victim were not married and he was not the girl's father. Irving said that the victim would receive a larger income tax refund under this arrangement than she would receive were she to claim her daughter; the victim and Irving agreed that he would give this money, totaling $2500, to her.

*Aldridge*, 2009 WL at *2. *See also* ECF No. 10-4 at 115-16.

Petitioner's new evidence does not establish a gateway claim of actual innocence. The victim's verbal and written statements are, as Aldridge points out, probative of the defense's theory that the girlfriend shot the victim; they suggest that Irving intended to harm Clariett. Nevertheless, the statements are not wholly reliable because they are hearsay evidence of what the victim told the police. *See Schlup*, 513 U.S. at 328 (the court must consider all evidence, regardless of its admissibility, but nevertheless must give "due regard to any unreliability of it") (internal quotation marks omitted). Moreover, unlike the substantial evidentiary materials that have opened the gateway in rare cases, the statements here do not directly implicate another person (Irving) or strongly preclude the defendant as the perpetrator. *See e.g.*, *House*, 547 U.S. at 549, 554 (petitioner established gateway claim of actual innocence where he "put forward substantial evidence pointing to a different suspect," namely the testimony of two witnesses who stated that the victim's husband confessed to the murder, and new forensic evidence that "called into question" the prosecution's "central forensic proof connecting [the petitioner] to the crime");

18

*Souter*, 395 F.3d at 590 (gateway claim established where new evidence was proof that a bottle—"the only evidence which directly tie[d] Souter to Ringler's death"—could not have caused Ringler's injuries).

In addition, and contrary to Petitioner's argument, Hull's identification of Aldridge as the shooter is not so unreliable as to be easily undermined or countered by the new evidence. As Aldridge points out, Hull was the only eyewitness besides Irving to identify Aldridge as the shooter and he viewed the events through a rearview mirror. Nevertheless, Hull was unwavering in his identification of Aldridge as the perpetrator. Moreover, Franklin corroborated key details given by Hull—such as describing a black male holding a bag and approaching the victim's car on the passenger side immediately before the shot was fired—thereby buttressing the reliability of Hull's view of the unfolding events. In sum, had the jury heard the new evidence together with the evidence admitted at trial, it is not "more likely than not that no reasonable juror" would have found Aldridge guilty of first degree murder beyond a reasonable doubt. *House*, 547 U.S. at 537.

Petitioner has not overcome the AEDPA's one-year limitations period under the actual-innocence doctrine. Because Aldridge has also failed to establish that he is entitled to traditional equitable tolling, the State's motion to dismiss the petition as untimely is **GRANTED**. The petition is **DISMISSED** and judgment shall be **ENTERED** for Respondent.

## APPEAL ISSUES

A § 2254 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); FED. R. APP. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. §§ 2253(c)(2) & (3). Although a COA does not require a showing that the

appeal will succeed, *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003), a court should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005).

In this case, there is no question that the petition should be dismissed for the reasons stated. Because any appeal by Aldridge does not deserve attention, the Court **DENIES** a certificate of appealability.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. FED. R. APP. P. 24(a). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *Id.*

In this case, for the same reasons it denies a COA, the Court **CERTIFIES**, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is therefore **DENIED**.

    **IT IS SO ORDERED**.

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: April 25, 2017